UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

                                        <u>MEMORANDUM & ORDER</u>

    -against-                     17-CR-0053 (JS)(ARL)

LORRAINE PILITZ, a.k.a. LORRAINE
CHRISTIE, a.k.a. LORRAINE STORMS,

                   Defendant.
-------------------------------X
APPEARANCES
For Government:        Adam Toporovsky, Esq.
                      United States Attorney's Office
                      271-A Cadman Plaza East
                      Brooklyn, New York  11201

                      Burton T. Ryan, Jr., Esq.
                      Madeline M. O'Connor, Esq.
                      United States Attorney's Office
                      610 Federal Plaza
                      Central Islip, New York  11722

For Defendant:        Richard M. Langone, Esq.
                      Langone & Associates, PLLC
                      600 Old Country Road, Suite 328
                      Garden City, New York  11530

SEYBERT, District Judge:

          Lorraine Pilitz ("Defendant") moves for (1) a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29 or, in the alternative, (2) a new trial on all counts pursuant to Rule 33.  (<u>See</u> Motion, ECF No. 152 <u>in toto</u>.)  For the reasons that follow, Defendant's Motion is DENIED.

BACKGROUND

The Court presumes familiarity with the record and summarizes the facts and evidence only as necessary for resolving Defendant's Motion.[1]

Defendant was charged in a five-count superseding trial indictment with: (1) structuring financial transactions in violation of 31 U.S.C. Sections 5324(a)(3), and 5324(d)(2) ("Count One" or the "Structuring Count"); (2) corruptly endeavoring to obstruct and impede the Internal Revenue laws in violation of Title 26 U.S.C. Section 7212(a) ("Count Two" or the "Obstruction Count"); and (3) filing false tax returns in violation of 26 U.S.C. Section 7206(1) for tax years 2010 ("Count Three"), 2011 ("Count Four"), and 2012 ("Count Five" and, collectively with Counts Three and Four, the "Tax Counts") (see Superseding Trial Indictment, ECF No. 130).

On September 30, 2022, the Government filed a Motion in limine to which the Defendant objected. (See Motion in Limine, ECF No. 103; Opp'n, ECF No. 108; Reply, ECF No. 111). The Court granted in part and denied in part the Government's Motion in Limine. (See Mem. & Order, ECF No. 119.)

---

[1] The facts are recited as relevant to the Court's analysis and are drawn from the Case Docket, the Trial Indictment, pre-trial proceedings, and the Trial Transcript ("Tr."). Citations to "GX" refer to the Government's exhibits.

Jury selection occurred on October 24 and 25, 2022. (See Min. Entry, ECF No. 124.) On October 25, 2022, the parties filed a joint request to charge and proposed verdict forms (the "Joint Request"). (See Joint Request, ECF No. 120). The Joint Request included jury instructions on forfeiture, if such instructions were needed, and a proposed special verdict form on the forfeiture issue. (See Gov. Request to Charge and Proposed Special Verdict Form, ECF No. 120-2, attached to Joint Request.)

Trial began on October 31, 2022, and concluded on November 9, 2022. (See Min. Entries for Proceedings, ECF Nos. 125, 134.) On November 9, 2022, the Jury returned a verdict finding Defendant guilty on all counts. (See Verdict Sheet, ECF No. 136.) After the Jury returned its verdict on the Structuring Count, the parties were permitted to supplement their case evidence on the issue of forfeiture. (See Tr. 962:7-13.) Both parties opted to rely on their case-in-chief evidence. (Id.) Thereafter, the Court charged the Jury on the issue of forfeiture and asked the jurors to complete the Special Verdict Form. (Id. 962:1-968:17.) Both parties were permitted to present closing arguments on the issue of forfeiture prior to the Jury beginning its forfeiture-related deliberations. (Id. 972:1-976:12.) Ultimately, the Jury found that the Government had proven, by a preponderance of the evidence, that several categories of property were "involved in" or were "traceable to" property involved in

3

Defendant's Structuring Offense and, thus, subject to forfeiture. (See Jury Verdict on Forfeiture, ECF No. 137.)  Specifically, the forfeited property included all right, title, and interest in "the real property located at 295 East Montauk Highway, Lindenhurst, New York" (the "Lindenhurst Property").[2]

After being granted extensions,[3] Defendant filed the instant Motion on February 21, 2023.[4]  (See Motion.)  The Government filed its opposition on February 27, 2023 (see Opp'n, ECF No. 153), to which Defendant replied on March 13, 2023 (see Reply, ECF No. 154).  Subsequently, on April 24, 2023, Defendant filed a motion

---

[2] In addition to the Lindenhurst Property the following property was also found to be subject to forfeiture: (1) "United States Currency in the amount of ten thousand nine hundred and seventy-two dollars and eighty-five cents ($10,972.85) . . . seized on June 4, 2014 from JPMorgan Chase Bank . . . held in the name Lorraine Pilitz"; (2) "United States Currency in the amount of twenty thousand four hundred thirty-three dollars and sixty-nine cents ($20,433.69) . . . seized on June 4, 2014 from JPMorgan Chase Bank . . . held in the name Virginia Christie Carpio"; and (3) "United States Currency in the amount of twenty-eight thousand two hundred two dollars and sixty cents ($28,202.60) . . . seized on June 4, 2014 from JPMorgan Chase Bank account . . . held in the name [Diana] Christie."  (Jury Verdict on Forfeiture.)

[3] On January 9, 2023, Defendant retained Richard M. Langone Esq. to represent her in this matter.  Mr. Langone replaced outgoing counsel, Bruce Barkett Esq., necessitating a 21-day extension.  (See Jan. 11, 2023 Elec. Order.)  This was Defendant's second extension.  (See Nov. 30, 2022 Elec. Order.)

[4] On February 16, 2023, Defendant filed her first motion to set aside the verdict and for a new trial.  (See First Motion to Set Aside Verdict, ECF No. 150.)  However, an amended motion was filed on February 21, 2023, (see Motion), due to a misstatement of fact in the original motion.

to supplement the instant Motion with one additional argument (the "Supplemental Argument").  (See Second Motion to Amend, ECF No. 163).  The Government opposed Defendant's request (see Opp'n to Motion to Amend, ECF No. 164); ultimately, the Court granted Defendant's Supplemental Argument motion.  (See May 1, 2023 Elec. Order.)  Afterwards, Defendant filed a supplemental reply. (See Supplemental Reply, ECF No. 165).  The Court considers Defendant's Supplemental Argument as part of the present Motion.[5]

## DISCUSSION

I.   Legal Standard

   A.   Rule 29 Motion for a Judgment of Acquittal

      Pursuant to Rule 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  "A defendant challenging a jury's guilty verdict 'bears a heavy burden.'"  United States v. Pauling, 924 F.3d 649, 656 (2d Cir. 2019) (quoting United States v. Martoma, 894 F.3d 64,

---

[5] To the extent Defendant raises additional arguments in her Supplemental Reply that were not previously presented to the Court, either in her original motion, the instant Motion or in her Second Motion to Amend, the Court declines to consider them.  See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (citing ABN Amro Verzekeringen BV v. Geologistics Americas, Inc., 485 F.3d 85, 100 N.16 (2d Cir. 2007)); see also United States v. Raniere, No. 18-CR-204-1, 2019 WL 2163189, at *5 n.5 (E.D.N.Y. May 16, 2019) (collecting cases).

72 (2d Cir. 2017)).  In evaluating a sufficiency challenge, a court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  Martoma, 894 F.3d at 72 (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).  As such, a court may grant a defendant's Rule 29(a) motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).  Consequently, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006) (second alteration in original) (citation omitted).

      B.    Rule 33 Motion for a New Trial

        Pursuant to Rule 33(a) "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  "When deciding a Rule 33 motion, the 'test is whether it would be a manifest injustice to let the guilty verdict stand.'"  United States v. Simels, 636 F. App'x 13, 15 (2d Cir. 2015) (quoting

United States v. Guang, 511 F.3d 110, 119 (2d Cir. 2007) (further citation omitted)).   This Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."   United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).

## II.   Analysis

Defendant primarily advances five arguments in support of her post-trial Motion.   First, on the Structuring Count, Defendant contends that absent, inter alia, evidence establishing "who actually deposited cash into the separate bank accounts, and proof as to the actual source of the cash, the evidence of structuring was both legally insufficient and against the weight of the evidence."   (Motion at 28 (emphasis in original).)   Second, on the Tax Counts, Defendant avers that the evidence shows she consistently notified her accountants to take care of her taxes and that they were hampered in their efforts "due to incomplete records." (Id. at 40.)   Third, on the Obstruction Count, Defendant

argues that she did not impede an IRS investigation but had instead "repeatedly direct[ed] her tax preparers to file the 2010, 2011 and 2012 returns." (Id. at 38.) Regardless, since "so much of the government's case rested on the alleged structuring and filing of false tax returns" Defendant argues that "if the verdict on either" Count One, Three, Four, or Five should be set-aside "then a new trial would have to be ordered" by the Court. (Id. at 39.) Fourth, Defendant contends that the Court's charge on circumstantial evidence "was necessary but not sufficient" in that it omitted certain key admonitions. (Id. at 35.) Finally, Defendant argues that the parties' forfeiture jury instruction defining 31 U.S.C. 5317(c)'s "property involved in" language was erroneous because this term "has never been interpreted to mean the statute reaches 'facilitating property.'" (Second Motion to Amend at 5.) The Court considers each of Defendant's arguments in turn and finds that they are without merit.

A.   The Trial Evidence on the Structuring Count Was Legally Sufficient to Prove Defendant Was Guilty Beyond a Reasonable Doubt

First, Defendant argues that "[t]he government's claim that Defendant's sister and mother" acted "in concert with her -- to hide cash defendant derived" from her "towing and collision repair business" was based upon "rank speculation." (Motion at 28.) Defendant highlights that where "two inferences are equally plausible, one consistent with guilt and the other with innocence,"

Defendant "was constitutionally entitled to the benefit of the doubt and a verdict of not guilty." (Id. at 29.) Defendant contests that an equally plausible inference existed, namely that her "sister Virginia and their mother Diana each had significant amounts of cash on hand from sources separate from" Defendant's towing business[6], "and [that] they [each] had vastly different interests." (Id.) Defendant notes that her mother "was living on money her [late] husband . . . left her from their restaurant business" and that her sister, Virginia, and Virginia's husband Carlos each "worked jobs where they were paid off the books and paid in cash." (Id.) Defendant asserts that "Virginia, Carlos, and [her] mother may all have been depositing cash into various bank accounts for their own separate purposes." (Id. at 30.) On this point, Defendant maintains that "[t]he government . . . never proffered a motive or interest" her mother or sister had "to assist defendant in structuring cash deposits from Auto Tech's business operations." (Id.) Similarly, Defendant emphasizes that the Government was unable to link any "of the 333 cash deposits" to Defendant either via handwriting or bank video surveillance showing who made the flagged deposits. (Id.)

---

[6] Despite testimony at trial that Defendant owned and operated multiple towing companies, for convenience, the Court will refer to Defendant's towing business in the singular.

The Government counters that "[a]ny rational juror could [] infer beyond a reasonable doubt that it was the defendant who made the structured deposits because the money came from the defendant, the money went into accounts owned or controlled by the defendant, and the structured money was used [to benefit] . . . the defendant." (Opp'n at 25-26.) Moreover, the Government asserts it "introduced evidence that physical deposit slips of many of the structured deposits were found pursuant to a search warrant in the defendant's place of business." (Id. at 26.)

Defendant next emphasizes that the Government was required to prove that she "knew of the reporting requirements and intended to avoid them." (Motion at 30.) Defendant contends that the Government's evidence on this issue was purely speculative. Specifically, Defendant notes that "the government produced a letter received from a bank in response to an information subpoena" (the "Capital One Letter") and that this "letter was addressed to Diana Christie and purported to inform her of CTR requirements." (Id.) Defendant argues there was no evidence introduced that the letter was ever mailed to Diana such that the Jury could infer that Defendant had seen the letter. (Id.) Additionally, Defendant avers that her accountants "admitted they never [] spoke with defendant about cash deposits" or told her "how [she] should handle cash deposits." (Id. at 30-31.)

10

In response, the Government highlights that it introduced evidence "which showed 23 total transactions -- of 59 total [split] deposits -- equaling $362,000" (Opp'n at 24-25), and that Defendant "repeatedly deposited cash in the bank that was just under $10,000." (Id. at 25.) The Government contends that "[t]he jury could infer from this pattern of structured deposits alone that the defendant knew that there was a reporting requirement and was trying to avoid it." (Id.) The Government points out that "to structure these amounts of cash, the defendant would have been required to go to the bank multiple times in a day, or to separate banks multiple days in a row." (Id.)

Defendant further argues that without evidence proving (1) "[t]hat defendant, as opposed to others, had more than $10K in cash in any one-day period," (2) the source of the cash, (3) the identity of the person(s) who made the cash deposits and signed the deposit slips, or (4) "[h]ow much cash, on average, Auto Tech made in a one day period to determine if the cash was actually being structured," "there was insufficient evidence to convict defendant of aggravated structuring." (Motion at 31.) The Government counters that the trial evidence was sufficient for any rational juror to conclude that Defendant structured more than $100,000 worth of deposits over a 12-month period. (Opp'n at 28.)

Pursuant to 31 U.S.C. § 5313(a) "domestic financial institutions generally must file [Currency Transaction Reports]

11

CTRs for cash transactions exceeding $10,000." <u>United States v. Taylor</u>, 816 F.3d 12, 22 (2d Cir. 2016) (citing 31 U.S.C. § 5313(a); 31 C.F.R. § 1010.311).  Section 5324 "prohibits individuals from structuring transactions to evade this reporting requirement." <u>Id.</u>  Section 5324 provides:

> No person shall, for the purpose of evading the reporting requirements of section 5313(a) . . . cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) . . . [or] structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a).  To prove Defendant guilty of the Structuring Count, the Government was required to prove she: (1) "engaged in acts of structuring;" (2) did so "with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000;" and (3) "acted with the intent to evade this reporting requirement." <u>Taylor</u>, 816 F.3d at 22 (quoting <u>United States v. MacPherson</u>, 424 F.3d 183, 189 (2d Cir. 2005)).

Here, there was sufficient evidence adduced at trial for the Jury to conclude that the Defendant was guilty, beyond a reasonable doubt, of structuring financial transactions.

1.   <u>The Defendant Engaged in Acts of Structuring</u>

To prove the first element of the Structuring Count, the Government first established that Defendant's towing business took

12

in cash and regularly dealt in cash.  The Government asked the Jury to infer that this cash was the source of the structured funds.  The evidence that Defendant's business took in cash and that Defendant used cash as part of her business operations was considerable.  For example, the Government presented text messages between Defendant and two customers in which Defendant actively encouraged her customers to pay in cash and not by check. (See, e.g., GX 432, GX 434).  Furthermore, in her civil deposition testimony, Defendant admitted taking in cash as part of her towing business (see Tr. 95:1-125:25), that this cash was not always banked, (id. 100:9-12), and that she paid her employees in cash (see id. 102:1-11).  Defendant's former employees, Errol K. Smith and Raymond White, also testified that Defendant's towing business took in cash as part of its day-to-day operations and that they were regularly paid in cash.  (See Tr. 358:7-9; 362:6-10; 366:20-367:4; 368:8-25.)  Additionally, the Government adduced evidence that the Defendant was solely responsible for the business' bookkeeping and that she was responsible for depositing any business checks into the bank. (See Tr. 101:13-23; 110:6-24; 368:12-25.)

The Government linked Defendant to the structured transactions through evidence establishing that the funds were deposited into accounts owned and/or controlled by Defendant. (See GX 489.)  Specifically, the at-issue accounts comprised: (1) four

business accounts for businesses owned by Defendant;[7] (2) two accounts in which Defendant was the sole named account holder;[8] (3) two accounts held by Diana Christie over which Defendant maintained a power of attorney;[9] (4) one account held by JRS Realty LLC;[10] (5) one account in which Defendant was named account holder as custodian for James R. Storms;[11] (6) one account held in the name Virginia Christie Carpio;[12] and (7) one account held by Diana Christie and George Christie.[13]   The Jury heard testimony from

---

[7] The four business accounts are: (1) Autotech Collision Inc., Operating Account held at JP Morgan Chase Bank, N.A. (hereafter, "JPMC"), ending No. 550 (the "Autotech Operating Account"); (2) Autotech Collision, Inc. II, L S Christie Pilitz, held at Oceanside Christopher Federal Credit Union, ending No. 722 (the "Autotech II Account"); (3) Autotech Inc. account, held at Capital One Bank, N.A., (hereafter, "Capital One"), ending No. 262 (the "Autotech Account"); and (4) Contiguous Towing, Inc. account, held at JPMC ending No. 000 (the "Contiguous Towing Account").

[8] The two accounts are: (1) a Capital One account, ending No. 073 (hereafter "Defendant Account I"), and (2) a JPMC account ending No. 384 (hereafter "Defendant Account II").

[9] The two accounts are: (1) a JPMC account ending No. 478 (hereafter, "POA Account I"); and (2) a Capital One account ending No. 967 (hereafter, "POA Account II").

[10] This is a Capital One account, ending No. 557 (hereafter, the "JRS Account").

[11] This is a JPMC account ending No. 521 (hereafter, the "Custodian Account").

[12] This is a JPMC account ending No. 872 (hereafter, the "VC Account").

[13] This is a JPMC account ending No. 121 (hereafter, the "Diana/George Christie Account").

14

Detective John Jacobsen ("Jacobsen") that bank statements and deposit slips from the at-issue accounts were seized during searches of Defendant's business office located at 132-136 South Long Beach Road, Rockville Centre (the "Rockville Centre Address"), and her home address located at 2845 Clubhouse Road, Merrick, New York (the "Home Address"). (Tr. 243:25-270:11; 306:1-16.) For example, at the Rockville Centre Address, authorities seized, inter alia: (1) transaction receipts and bank statements for POA Account I (see GX 492; GX 332; GX 339); (2) bank statements and deposit slips for the JRS Account (see GX 492; GX 335; GX 342); (3) bank statements for the VC Account (see GX 492; GX 336); and (4) bank statements for the Diana/George Christie Account (see GX 492; GX 332). At Defendant's Home Address authorities seized, inter alia, bank statements for the JRS Account (see GX 492; GX 393), and one bank statement for POA Account II. (GX 393 at 65.)

After establishing the source of the funds and linking Defendant to the accounts into which the funds were structured, the Government next demonstrated that the structured funds were used to benefit Defendant. For example, Peter Culliney testified that his family sold the Lindenhurst Property to the Defendant. (Tr. 515:1-517:10.) Defendant signed the sale contract and other various paperwork as the buyer. (Id. 518:15-22.) Culliney testified that the Lindenhurst Property was paid for with three checks including a $227,592 cashier's check from POA Account I and

15

an $86,000 cashier's check from the VC Account. (Id. 522:20-525:7; see also GX 414.) Culliney stated that he had never heard of either Diana Christie or Virginia Carpio before the closing, that he had only ever dealt with Defendant and, moreover, that "[t]here were more checks that [he] expected on that day." (Id. 524:1-525:4.) Evidence offered by the Government was sufficient for the Jury to determine that Defendant was the individual who ordered the certified check from POA Account I (see id. 610:2-611:3), and that structured funds were used to purchase it. (See id. 573:19-574:14). After it was purchased the Lindenhurst Property was utilized by Contiguous Towing and Certified Collision, two companies owned by Defendant. (See GX 375.) Separately, Culliney testified that after signing the sale contract on the Lindenhurst Property Defendant contacted him, requesting they change the sale contract to reflect a lower purchase price, but that Defendant would cover the difference between the adjusted purchase price and the true sale price with cash. (Tr. 520:23:521:13.) Culliney testified Defendant had reasoned the change would reduce Defendant's tax liability on the deal and ultimately benefit all parties. (Id.) Culliney refused Defendant's cash offer. (Id. 521:14-19.)

Further, evidence adduced at trial established that Defendant had paid Lynch, a large tow truck provider, $71,000 via check. (See GX 187; see also Tr. 428:15-429:1.) The Government

offered evidence that the funds used to cover the $71,000 check derived from POA Account I ($41,000) and Defendant Account II ($30,000). (See GX 457). Like certain of the funds used to purchase the Lindenhurst Property, the funds used to purchase the check to Lynch derived from structured funds. (See id. 578:21-579:23.) The original deposit check for the $71,000 payment to Lynch was recovered from the Rockville Center Address. (Id. 87:13-19; 302:12-15; GX 354.)

Another check for $51,000 was made to the New York State Department of Transportation (the "DOT"), with Contiguous Towing, Inc. as the remitter. (GX 327.) The funds to purchase this check came from POA Account 1, (see GX 457), and copies of the check were seized from Defendant's Rockville Center business office. (Tr. 87:13-19.) IRS Agent Heather McCue ("McCue") testified that funds used to purchase the check came from structured funds. (Id. 583:20-584:16.) McCue also testified that she determined that Defendant's structuring activity exhibited a pattern such that whenever Defendant anticipated making large purchases, such as the payment to Lynch and the DOT, structuring activity in the at-issue accounts increased. (See id. 480:9-587:23.)

Defendant's argument that Diana Christie and Virginia Carpio each had significant, separate, sources of cash and could have been depositing funds into the at-issue bank accounts for their own purposes is unavailing; indeed, this theory was presented

17

to, and rejected by, the Jury.  The Jury heard testimony that Virginia Caprio worked predominantly at Macy's before retiring and working "off the books" at the Bronx fish market.  (Id. 616:7-13; 620:10-16.)  Similarly, the Jury heard that Carlos Carpio worked as a bartender at Morton's Steakhouse.  (Id. 619:23-620:5.)  Defendant elicited testimony that both Virginia and Carlos were paid in cash.  (Id. 620:8-16.)  However, when presented with the $87,000 check used to purchase the Lindenhurst Property, Carlos testified that neither he nor his wife had that kind of money.[14]  (Id. 618:6-10.)  In fact, other than a property in Pennsylvania, Carlos testified that neither he, nor his wife, invested in any other real estate and, upon Virginia's death, he was not notified that Virginia had any interest in the Lindenhurst Property.  (Id. 617:18-21; 618:11-18.)  Similarly, while Defendant established that Diana and George Christie previously owned a Manhattan restaurant that was possibly sold for cash (id. 620:19-621:4), testimony also established that this sale likely took place more than 30 years ago.  (Id.  at 622:7-19.)

---

[14] In her Reply, Defendant argues that Virginia may have taken out an SBA Loan without her husband's knowledge.  (Reply at 3.)  There was no testimony on this issue at trial, although the Jury heard testimony that Virginia was primarily responsible for maintaining her family's financial affairs.  (Tr. 621:5-12.)  Nevertheless, the Jury credited Carlos' testimony that his family did not have the money needed to invest in the Lindenhurst property.

Viewing all the Government's structuring evidence in its totality, the Court finds that it was reasonable for the Jury to infer that Defendant engaged in structuring. Similarly, the Court finds that, to the extent the Jury considered and rejected Defendant's theory that others could have been the source of the cash, it was not unreasonable to do so given the robust evidence of structuring presented to it.

2. Defendant Structured Transactions with Knowledge of the CTR Reporting Requirements

To establish Defendant's knowledge of the CTR reporting requirements the Government presented the Capital One Letter which it obtained through Capital One's Compliance Office. The Capital One Letter was addressed to Diana Christie and informed her of the CTR reporting requirements. (GX 213; Tr. 341:14-342:25.) The Government did not adduce evidence that the Letter was actually sent or that Defendant had seen the Letter. (Id. 343:1-344:1.) Defendant seizes upon these facts and argues that because there was no evidence that she saw the Capital One Letter and no evidence that her accountants had discussed the CTR reporting requirements with her, the Jury impermissibly relied upon speculation in concluding that Defendant structured transactions with knowledge of the CTR reporting requirements.

However, to establish the knowledge requirement, the Government also produced pattern evidence. For example, the

19

Government's evidence showed that, in accounts controlled or owned by Defendant, 23 total transactions were structured and that these transactions comprised of 59 total deposits equaling $362,000. (See GX 456.)  That is, individual deposits often consisted of amounts below the $10,000 CTR threshold but aggregated more than the $10,000 limit by thousands of dollars.  (Id.)  For example, from October 10 to 11, 2012, the Government's evidence showed that Defendant deposited cash in multiple bank accounts on five separate occasions.  (Id.)  On October 10: (1) $9,000 was deposited into POA Account II; (2) $7,000 was deposited into POA Account I; (3) $1,000 was deposited into Defendant Account II; and (4) a further $1,000 was deposited into Defendant Account II.  (Id.)  On October 11 an additional $8,000 was deposited into POA Account II.  (Id.) These five deposits totaled $26,000.  (Id.)  Similarly, on November 9, 2012, two deposits, each $9,000, were made, into two separate bank accounts for a total of $18,000.  (Id.)  Between June 12 and 14, 2013 $25,000 was broken into three deposits each below the $10,000 threshold. Specifically, $7,000 was deposited into POA Account I, $9,000 was deposited into the VC Account on June 13, and an additional $9,000 was deposited into the VC Account on June 14, 2013.  (Id.)

The Government presented evidence that From January 12, 2010 through October 15, 2013, across each of the at-issue accounts, there were a total of 330 cash deposits.  (See GX 491.)

20

Of the 330 cash deposits, Defendant made only one deposit over the $10,000 threshold. (See id.) Compare Taylor, 816 F.3d at 25 (finding case evidence did not evince an intent to evade reporting requirements where defendant made 17 deposits over the $10,000 limit compared to only seven split deposits, "often only days before and after he was allegedly trying to avoid CTRs being filed by making split deposits").

In addition to the pattern evidence, the trial evidence further included a letter from Chase Bank's compliance office to Virginia Carpio, which was mailed to her at 3214 Monterey Drive, New York. (GX 344.) It outlines transactions identified in the VC Account "that [would] need further explanation." (Id.) Despite being mailed to Virginia Carpio, the letter was recovered from Defendant's Rockville Centre Address during a search and seizure. (Tr. 268:9-15.)

Consequently, the Court finds that, viewing the knowledge evidence in its totality, a reasonable jury could infer Defendant's knowledge of the CTR reporting requirements beyond a reasonable doubt.

3.   The Record Evidence Sufficed to Show That Defendant Structured More Than $100,000 Over a 12-Month Period

The Government argues its evidence conclusively establishes Defendant structured more than $100,000 over 12 months. (See Opp'n at 28 (citing GX 456)). Defendant primarily

relies upon her arguments articulated above, namely that the Government failed to prove: (1) "[t]hat defendant, as opposed to others, had more than $10k in cash in any one-day period"; (2) "[w]here the cash came from"; (3) "[w]ho made the cash deposits"; (4) "[w]ho signed the cash deposit slips"; and (5) "[h]ow much cash, on average, Auto Tech made in a one day period to determine if the cash was actually being structured." (Motion at 31.)

Section 5324(d)(2) of the U.S. Code provides that "[w]hoever violates this section while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3)" of § 3571.

As discussed _supra_, the Court has already determined the trial evidence was sufficient to establish the following. First: Defendant's business took in cash as part of its operations, therefore, it was permissible for the Jury to infer this cash was the source of the structured funds. Second: Defendant's ownership and/or control over the accounts at-issue, together with her structuring funds in a way that benefitted Defendant's businesses, was a reasonable basis for the jurors to infer Defendant was the individual engaged in acts of structuring. Three: the Government's pattern evidence showed that 23 structured

22

transactions comprised of 59 split deposits in denominations less than $10,000, which was sufficient for the Jury to infer Defendant's knowledge of the CTR reporting requirements. Moreover, the Court finds that sufficient evidence was offered to show Defendant structured more than $100,000 worth of deposits over 12 months.  (See, e.g., GX 456 (showing that in 2012 there were eight structured transactions totaling $137,200 in deposits, and in 2013 there were 14 structured transactions totaling $224,800 in deposits).)

As such, the record evidence sufficed to show Defendant structured more than $100,000 in deposits over a 12-month period, thereby satisfying the requisite element of Section 5324(d)(2).

B.    The Trial Evidence Related to filing of False Tax Returns (Counts 3-5) Was Sufficient

On the Tax Counts, Defendant argues that since "the false tax return counts are based on the failure to report the alleged 'structured' cash deposits," dismissal of the Structuring Count means that the Tax Counts "must also be dismissed based on insufficient evidence."  (Motion at 39-40.)  Additionally, Defendant highlights that at trial both of Defendant's "accountants admitted making careless mistakes in preparing defendant's tax returns."  (Id. at 40.)  Defendant posits that "the accountants may have been hampered in preparing the tax returns due to incomplete records" caused by authorities who, in

"seiz[ing] <u>all</u> the files in defendant's home and office . . . returned only part of what they took." (<u>Id.</u> (emphasis in original).)  In opposition, the Government highlights that the trial evidence showed that all of Defendant's tax returns for years 2010, 2011, and 2012 showed material misstatements in that they "understated the taxable money that Autotech brought in." (Opp'n at 20-21.)  The Government also notes that the accountants who prepared the tax returns were directed to do so by Defendant and Defendant had declared under penalty of perjury that the tax returns for the years in issue were correct. (<u>Id.</u> at 22.)  Finally, the Government highlights there was sufficient evidence for "[a]ny rational juror [to] have found beyond a reasonable doubt that the defendant's actions were not the result of mistake." (<u>Id.</u> at 22.) On this point, the Government emphasizes:

> (1) [A]ccording to Revenue Agent Berzansky's testimony, the defendant consistently understanded her income rather than overstated it; (2) the defendant filed incomplete returns; (3) the defendant hid Autotech checks in family accounts and in her personal account; and (4) the defendant hid hundreds of thousands of dollars of business income year after year after year.

(Opp'n at 23.)

To prove Defendant violated 26 U.S.C. § 7206(1), the Government was required to prove:

24

> (1) that [D]efendant made or caused to be made
> an income tax return for the relevant year,
> which [s]he verified was true; (2) that the
> tax return was false as to something material;
> (3) that [D]efendant willfully signed the
> return knowing it was false; and (4) that the
> return stated that it was made under penalty
> of perjury.

United States v. McGinn, 787 F.3d 116, 125 (2d Cir. 2016) (citing

United States v. LaSpina, 299 F.3d 165, 179 (2d Cir. 2002)).

Generally, "a false statement is material if it has a

natural tendency to influence, or [is] capable of influencing, the

decision of the decisionmaking body to which it was addressed."

United States v. Shellef, 732 F. Supp. 2d 42, 62 (E.D.N.Y. 2010)

(quoting Neder v. United States, 527 U.S. 1, 16 (1999) (internal

quotations omitted)).  The materiality of a false statement under

26 U.S.C. § 7206, "may be examined by looking at whether the

statement was essential to an accurate computation of taxes

owed . . . and/or whether the statement had the potential to

hinder the IRS's ability to verify the tax liability at issue."

United States v. Olazabal, No. 13-CR-0467, 2014 WL 11460470, at *4

(E.D.N.Y. June 10, 2014) (citing United States v. Klausner, 80

F.3d 55, 60 (2d Cir. 1996) (further citation omitted)).

Additionally, to prove that the Defendant "willfully" subscribed

to a tax return that was false as to a material matter the

Government must "'negat[e the] defendant's claim' that [s]he 'had

a good-faith belief that [s]he was not violating any of the

25

provisions of the tax laws.'"  United States v. Weber, 843 F. App'x 364, 367 (2d Cir. 2021) (quoting Cheek v. United States, 498 U.S. 192, 202 (1991)).  "While a defendant's good-faith reason need not be objectively reasonable, the objective reasonableness of a claimed belief may be probative of whether the defendant held the belief in good faith."  Id.

> 1.  Defendant Caused to be Made Income Tax Returns She Verified to be True

As an initial matter, testimony at trial from misters Maiure, Goetz and Kovler established that each of them was retained by Defendant to prepare tax returns at her direction.  (See Tr. 126:23-130:24; 382:10-387:8; 450:1-451:4.)  Defendant does not dispute this element.  (See Motion, in toto.)  Additionally, all the returns at issue contained written declarations signed by Defendant that they were made under penalties of perjury and, as noted by the Government, Agent Berzansky, a Revenue Agent Fraud Specialist ("Berzansky") read these sworn declarations to the Jury as part of his testimony.  (See GX 62, 64, 67, 68, 92, 93; see also Tr. 679-80, 683, 695-96, 701-04.)  Consequently, there was ample credible evidence for the Jury to find this element satisfied.

> 2.  The Tax Returns Were False as to a Material Matter

Sufficient evidence was also presented at trial for the Jury to conclude, beyond a reasonable doubt, that the Defendant's

returns for tax years 2010, 2011 and 2012 contained material understatements of income.  For example, Berzansky testified he had reviewed all taxable deposits that went through the Autotech Operating Account, the Autotech II Account, the Autotech Account, POA Account I, the JRS Account, and Defendant Account II. (Tr. 638:1-639:22.)  Berzansky testified that the term "taxable deposits" meant "the gross receipts of the gross sales of the business."  (Id. 640:8-19.)  In determining what qualified as a taxable deposit, Berzansky stated that he followed several criteria, including: (1) "whether or not the check was deposited into an Auto Tech account directly;" (2) "whether or not the check was from an insurance company;" (3) "whether or not Auto Tech was listed as the payee on the check;" (4) "whether there was a claim number on the check, [or] a claimant's name on the check;" and (5) whether there was other identifying information on the check, such as where the check indicated it was for car repairs.  (Id. 645:25-646:15.)

Utilizing the criteria previously articulated, Berzansky identified $318,498.34 in taxable deposits for tax year 2010.[15] (Id. 661:8-13; see also GX 458.)  In contrast, Defendant's 2010

---

[15] The breakdown of 2010 taxable deposits per account was: (1) $149,797.53 in the Autotech Operating Account; (2) $91,538.98 in POA Account I; (3) $47,217.54 in Defendant Account II; and (4) $29,944.29 in the Autotech Account.  (See GX 458.)

Form 1120S filed with the IRS stated that Autotech brought in $199,251 in gross receipts, which was an understatement of $119,247.34. (See GX 64; GX 490.) Similarly, applying the same criteria for the 2011 tax year, Berzansky identified $215,600.74 worth of taxable deposits.[16] (Tr. 670:20-23.) However, Defendant's 2011 Form 1120S disclosed only $121,477 worth of gross receipts. (GX 67.) This disclosure resulted in an understatement of $94,123.74. (GX 490.) Likewise, in 2012, Berzansky identified $208,466.66 in taxable deposits in the reviewed accounts.[17] (Tr. 674:5-9.) Defendant's 2012 Form 1120S disclosed gross receipts of only $140,038. (GX 68.) This disclosure equated to an understatement of income of $68,428.66. (GX 490.) As explained by Berzansky, Defendant's understatements of gross receipts on her 1120S forms was material because the understatements flowed through the 1120S Forms to Defendant's 1040 Forms, i.e., her

---

[16] The breakdown of 2011 taxable deposits per account was: (1) $14,610.28 in the Autotech Account; (2) $3,756.22 in the JRS Account; (3) $124,209.10 in the Autotech Operating Account; (4) $48,409.07 in POA Account I; and (5) $17,399.73 in Defendant Account II. (Id.) Additionally, a check for $7,216.34 was found by Berzansky that could not be found in any of the accounts that he reviewed. (Id.; see also Tr. 667:6-668:12.)

[17] The breakdown of 2012 taxable deposits per account was: (1) $20,471.50 in POA Account I; (2) $108,690.49 in the Autotech Operating Account; (3) $38,417.81 in Defendant Account II; and (4) $27,733.60 in the Autotech II Account. Further, two additional checks were identified by Berzansky but he was unable to find them in any of the accounts he reviewed. Cumulatively, these missing checks totaled $13,153.26. (See GX 458; Tr. 673:9-674:4.)

individual income tax returns. (Tr. 681:11-682:13.) Therefore, understatement of gross receipts affected the IRS's calculation of Defendant's personal tax liability, a fact upon which Defendant's own expert, Mr. Robert Upbin, agreed. (See id. 777:1-16; 788:1-789:6.) Additionally, there was evidence adduced at trial that Defendant failed to disclose on her tax returns any rental income despite corroborating testimony from Mr. Pritam Bindra that Defendant had received rental income on at least one occasion in 2012 from him. (See Tr. 283:1-287:12; see also GX 187 at 368.) Further evidence at trial showed Defendant likely received rental income in 2010 that was unreported. (See e.g., GX 366.)

### 3. Defendant Willfully Subscribed to False Returns Under the Penalty of Perjury

On the issue of willfulness, Defendant attempts to deflect blame onto her accountants for the understatements in her tax returns. Alternatively, Defendant argues that the understatements are attributable to her accountants being hampered by the Government not returning complete records of items seized during searches. In reviewing both of these arguments, the Court finds them to be meritless.

As previously stated, the trial evidence established Defendant's business took in cash as part of its operations, yet Defendant failed to inform her accountants of this fact. (See Tr. 134:7-135:21; 387:9-388:18; 453:24-454:10.) Similarly, Defendant

failed to disclose to any of her accountants that she received rental income. (Id. 143:7-25; 391:1-10.)  Indeed, Kovler testified he was affirmatively told by Defendant that she had neither cash nor rental income.  (See id. 453:21-454:10.)  Additionally, Berzansky's testified Defendant was underreporting her business income for the tax years in question, achieving this by depositing business checks in personal accounts.  None of Defendant's accountants recalled Defendant ever informing them that this was her practice.  (See e.g, id. 133:4-7.)  Indeed, Goetz could not recall Defendant ever informing him that she was keeping business checks in personal accounts, and, to the best of his knowledge, the only accounts he reviewed in preparing Defendant's personal tax returns were business accounts.[18]  (Id. 389:7-19.)  Goetz extrapolated that there was no reason to look at Defendant's personal bank statements because business checks, generally, do not belong in personal bank accounts. (Id. 389:1-6.)  Similarly, when Kovler was asked if Defendant had given him any personal statements, or statements from individuals to prepare her business

---

[18] Goetz also testified that he could not remember Defendant ever providing him with bank statements from other individuals to prepare her personal returns.  (Tr. 391:15-24.)  Further, Goetz testified that had Defendant done so, it would have stood out to him.  (Id. 391:25-392:2.)

tax returns, Kovler testified that Defendant had not.  (Id. 451:14-452:5.)[19]

The Jury was free to determine that (1) Defendant's omissions in the information she gave her accountants, (2) her practice of depositing business checks into non-business accounts, and (3) the subsequent underreporting of gross business receipts that resulted, all undercut Defendant's assertion that she had good faith belief that she was complying with the tax laws.   In other words, it was the jury's domain to assess Defendant's credibility; upon the evidence presented the jury rejected Defendant's purported good faith belief.

C.    Impeding an IRS Investigation (Count 2)

Defendant next contends that the evidence introduced to prove the Obstruction Count was "legally insufficient," making her conviction "against the weight of the evidence."  (Motion at 38.) Specifically, Defendant argues the trial evidence showed that whenever she was "personally informed of IRS inquiries, she immediately notified her accountants" to take care of the matters. (Id.)   Additionally, Defendant notes that "the government's exhibits reveal defendant repeatedly direct[ed] her tax preparers

---

[19] Kovler also testified that he did eventually become aware that Defendant was depositing business checks in personal accounts but that he could not recall when and speculated that this understanding came after he had filed Defendant's returns.   (Id. 492:14-494:20.)   Regardless, when he found out, Kovler testified that he "was surprised."   (Id.)

31

to file the 2010, 2011, and 2012 tax returns." (Id.) Defendant emphasizes that her civil deposition testimony demonstrated "that she believed (from her accountants) that her personal income tax returns were 'on extension.'" (Id.) Defendant avers that "she was also told by her accountants that she did not owe any income tax because of business expenses (and relatively low gross receipts)" and that this "may have misled defendant into believing she was not obligated to file[] an income tax return." (Id. at 38-39.) Finally, Defendant states that "if the verdict on either Count I or Counts III [through] V are set-aside, then a new trial would have to be ordered" because "so much of the government's case rested on the alleged structuring and filing of false tax returns." (Id.)

The Government counters that, throughout the trial, there were several categories of evidence presented that showed Defendant was aware of IRS proceedings. (Opp'n at 31.) Once Defendant was placed on notice of these proceedings, the Government contends Defendant "endeavored to obstruct and impede the IRS" by, inter alia, hiding checks in her son's Minor Trust Account, "purposely fil[ing] incomplete tax returns," soliciting cash from clients and paying employees under the table with cash, structuring cash, and lying to her accountants. (Id. at 31-32.) The Government argues the trial evidence established "that

32

the defendant did not want to pay taxes" and that she sought an advantage in paying lower taxes. (Id.)

Section 7212(a) of the U.S. Code provides that any individual who:

> corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall [be guilty of a felony].

United States v. Kelly, 147 F.3d 172, 175 (2d Cir. 1998) (emphases omitted) (quoting 26 U.S.C. § 7212(a)).  To prove the Defendant guilty of a corrupt endeavor to obstruct and impede the Internal Revenue laws, the Government was required to prove that the Defendant: "(1) endeavor[ed] to obstruct or impede the due administration of a pending or reasonably foreseeable tax-related proceeding; and (2) act[ed] corruptly in doing so." United States v. Little, No. 12-CR-0647, 2018 WL 5668874, at *3 (S.D.N.Y. Nov. 1, 2018) (citing Marinello v. United States, 138 S. Ct. 1101, 1109-10 (2018); United States v. Parse, 789 F.3d 83, 121 (2d Cir. 2015)).  "To 'endeavor' to obstruct or impede the due administration of a proceeding is to knowingly and deliberately act or make an effort that has a reasonable tendency to obstruct or impede a proceeding." Id. (citing Kelly, 147 F.3d at 176-77).  The "well-accepted

33

definition of the term 'corruptly' when used in this context" means "to act with the intent to secure an unlawful advantage or benefit either for one's self or for another." Kelly, 147 F.3d at 177.

    1.   Defendant Endeavored to Obstruct or Impede the Due Administration of a Pending or Reasonably Foreseeable Tax Proceeding

The Government provided sufficient evidence on each element of the Obstruction Count such that a reasonable juror could conclude, beyond a reasonable doubt, that Defendant endeavored to obstruct or impede a pending or reasonably foreseeable tax proceeding. As an initial matter, the trial evidence sufficiently established there was a pending or reasonably foreseeable tax-related proceeding in progress at the time Defendant engaged in acts of obstruction. For example, evidence established IRS Revenue Agent Lew Alter ("Alter") had sent Defendant correspondence outlining the IRS's intent to "obtain unfiled returns" from Defendant. (GX 324.) Alter's letter further stated that Defendant "should already be aware of this from [the IRS's] previous contacts" with her. (Id.) The parties stipulated to the fact that Alter's correspondence and IRS collection letters were recovered from Defendant's Rockville Centre Address. (Tr. 87:13-19.) The collection letters outlined that the IRS was attempting to collect $13,061.41 in unpaid payroll taxes for tax periods 2009-2011. (GX 324 at 4-5.) Trial evidence further showed the IRS had issued a notice of levy to JPMC that, in turn, had mailed a letter

34

to Defendant informing her of this fact on August 24, 2013. (Id. at 6-7.)  In sum, the total levy amount listed was $13,462.84. (Id. at 8.)   Additional IRS levies and further letters of notification concerning past-due collections were recovered from Defendant's Rockville Centre Address.  (Tr. 311:13-312:7; GX 412.)

Defendant's accountants further testified that Defendant had consulted them regarding the IRS correspondence and levies. For example, Goetz testified that "from time to time" Defendant would get notices from the IRS for payroll taxes.  (Tr. 398:14-20.)  Goetz stated that sometimes Defendant would make payments on the payroll taxes that would bounce "or not get mailed" or otherwise be received by the IRS.  (Id. 398:23-399:4.)  Goetz also testified that when preparing quarterly payroll taxes for Defendant, the payments received by the IRS would not always match checks, check stubs, and bank statements that reflected payroll tax payments made.  (Id.)   Also, while he could not recall specifically, Goetz was sure he had told Defendant that she should pay the payroll taxes, and this was his usual practice.  (Id. 399:5-18.)   Similarly, Kovler testified that when Defendant reached out to him regarding the correspondence received from Alter, he advised that Defendant should pay the taxes "because of the civil penalty and the personal liability."  (Id. 472:7-473:14.)

Upon the trial evidence, the Jury was free to reject both arguments Defendant raises here, namely (1) when informed of

the IRS's collection efforts, Defendant had immediately directed her accountants to take care of the issue, and (2) any mistakes on her returns was due to the Government's failure to return essential business records.  As previously stated, the Government's evidence established Defendant's business took in cash and that, in 2016, she was actively soliciting cash payments from customers in lieu of checks.  (GX 432; GX 434.)  While there was trial evidence Defendant did reach out to Kovler and directed him take care of the IRS issue, there was also evidence Kovler relied upon information relayed to him by Defendant to complete the returns.  (Tr. 450:9-451:4; 498:1-19.)  Other evidence showed that the information supplied to Kovler was inaccurate because, inter alia, Defendant omitted to inform Kovler that she took in cash as part of her business, and that she had rental income to disclose. (Id. 453:24-454:10.)  Similarly, Defendant failed to disclose to Kovler that she had deposited business checks in non-business accounts. (Id. 451:14-452:5.)  Defendant continued to deposit business checks in non-business accounts even after being informed of the IRS's collection efforts.  Moreover, there was trial evidence that in May 2014, the Government seized funds from three of the at-issue accounts pursuant to a search warrant.  (Id. 212:11-25.)  In response, Defendant opened a minor trust account for her son and began depositing business checks and rental checks into that account.   (Id. 214:16-215:16.)   Moreover, separate evidence

36

presented established Defendant had filed incomplete returns. (See GX 93; Tr. 703:9-705:13.)   Thus, the Jury, presented with this trial evidence, heard, but rejected, Defendant's position.

Similarly, the Jury did not credit Defendant's argument that she was hampered in her efforts to file complete returns because the Government failed to return business documents after its searches and seizures.  This determination was made after the Jury heard Kovler's testimony that he would have used check stubs, if he had had them, to complete Defendant's business returns but he did not do so because Defendant had told him the check stubs had not been returned to her (Tr. 498:1-19; 513:1-11);  he had relied upon information provided to him by Defendant to complete the returns, including where there was no documentary evidence available (id. 450:6-451:4; 513:16-514:5); and he did not review the returns with Defendant because, in his view, she did not care. (496:24-497:2; 514:9-19.)

As to the unlawful advantage that Defendant sought to obtain in her obstruction efforts, upon the trial evidence the Jury was free to infer Defendant sought to secure for herself the advantage of reducing her taxable income by willfully understating the gross receipts of her businesses.  As stated supra, this understatement of business receipts had the effect of lowering Defendant's personal tax liability since the losses generated by the businesses would flow through to her personal tax returns.

There was also testimony by Culliney that Defendant was aware that dealing in cash could provide her with tax advantages.

For all of these reasons, the Jury had before it ample evidence to conclude that Defendant impeded the IRS's investigation.

D.   The Court's Circumstantial Evidence Charge Was Correct and Sufficient

Next, Defendant argues the Court's jury instruction regarding circumstantial evidence -- to which Defendant's counsel did not object -- was necessary but insufficient.  (Motion at 35.) Defendant contends the charge should have included "the following admonitions": (1) that "an inference must derive from a fact proven beyond a reasonable doubt;" (2) that "piggy-backing inferences (i.e., piling inference upon inference) is not permissible;" and (3) that "if two inferences can be derived from the circumstantial evidence, one consistent with innocence and one consistent with guilt, under the Presumption of Innocence, defendant is entitled to the benefit of the doubt."  (Motion a 36.)  Defendant posits that "[t]he failure to include [these] counter-balancing caveats to the ways in which jurors might use the circumstantial evidence created a . . . risk that the jury employed an incorrect reasoning process."  (Id.)

The Government contends "[t]he parties jointly recommended a jury charge to the court that included" the at-issue

38

instruction "as to circumstantial evidence."  (Opp'n at 32.)  It argues further that "the defense's objection" essentially "boils down to phrasing."  (Id.)  For example, the Government emphasizes that the Court instructed the Jury:

> (1) regarding          reasonable          doubt;
> (2) specifically,  that  when  drawing  an
> inference 'you are not permitted to engage in
> mere guesswork or speculation'; (3) that the
> burden  of  proof  'never'  shifts  to  the
> defendant; and (4) that the jury is to draw
> 'reasonable' inferences from the facts that
> they find to be 'proved.'

(Id. at 33.)  Consequently, the Government asserts that "although the  Court  did  not  use  the  exact  words  the  defense  [now] recommends . . . it did in fact instruct the jury as the defense suggests."  (Id.)

"[A] defendant does not have the right 'to dictate the precise language of a jury instruction.'"  United States v. Yousef, 327 F.3d 56, 158-59 (2d Cir. 2003) (quoting United States v. Imran, 964 F.2d 1313, 1317 (2d Cir. 1992)).  In fact, "[t]he trial court has substantial discretion to fashion jury instructions, so long as they are fair to both sides."  United States v. Zodhiates, 901 F.3d 137, 144 (2d Cir. 2018) (citing United States v. Russo, 74 F.3d 1383, 1393 (2d Cir. 1996)).  Consequently, "[a] conviction will be reversed for refusal to give a requested charge only if the requested instruction is 'legally correct, represents a theory of defense with basis in the record that would lead to acquittal,

39

and the theory is not effectively presented elsewhere in the charge.'" United States v. Kerley, 544 F.3d 172, 177 (2d Cir. 2008) (quoting United States v. Doyle, 130 F.3d 523, 540 (2d Cir. 1997)).

Here, the joint charge was both legally correct and sufficient; moreover, the objections raised by the Defendant in the present motion were adequately addressed throughout the charge.  For example, the Court instructed the Jury that when drawing inferences, it was "not permitted to engage in mere guesswork or speculation."  (Tr. 898:3-7.)  Instead, the Court informed the Jury that "[f]rom the facts that [it] f[ound] to be proved, [it was] permitted to draw reasonable inferences as would be justified in light of [its members'] experience."  (Id. 897:14-16 (emphasis added.))  The Jury was specifically instructed that an inference was defined as a "deduction or conclusion that it . . . [was] permitted -- but not required -- to draw from the facts that have been established from the evidence in the case."  (Id. 897:17-20 (emphasis added.))  In conjunction with instructions on drawing permissible inferences, the Jury was also adequately instructed as to the definition of reasonable doubt and, additionally, that the Defendant enjoyed a presumption of innocence.  (See id. 891:24-892:19.)  The Court stressed that, "The law presume[d] the Defendant to be innocent of all the charges against her;" further, the Court instructed the Jury that "the

Defendant [wa]s to be presumed . . . innocent throughout [its] deliberations until such time, if ever, [the Jury was] satisfied that the Government has proven the Defendant guilty beyond a reasonable doubt." (Id. 891:4-9.)  The Jury was admonished that, as part of the presumption of innocence, "the burden [was] on the prosecution to prove guilt beyond a reasonable doubt" and "[t]his burden never shifts to the Defendant." (Id. 892:15-23.)  Taken in conjunction, the Court's instructions on permissible inferences, the standard of proof, and the presumption of innocence, sufficiently instructed the Jury that any inference it may be inclined to draw must be both reasonable and drawn from facts that it found to be proved -- i.e., facts the Government had proved to be true beyond a reasonable doubt.  Taken as a whole, the charge was sufficient.[20]  Cf. United States v. Kopstein, 759 F.3d 168, 172

---

[20] Defendant's reliance on United States v. Morales, 577 F.2d 769 (2d Cir. 1978) is misplaced.  The Morales jury was charged that, if it found beyond a reasonable doubt, that the defendant had fabricated false documentary evidence to mislead investigatory authorities. then it could "consider that fact as probative of the defendant's guilt."  Id. at 772.  In reversing, the Second Circuit held that the district court "prejudiced [the defendant] by misstating the relevance of an act whose ambiguity should have been resolved by the jury" because the district court's instruction indicated that the defendant's "conduct was unequivocally probative of guilt" when it actually was merely admissible to show consciousness of guilt.  Id. at 772-73.  This error was compounded by the fact that "the erroneous instruction immediately followed the prosecutor's argument in summation that the [defendant's] use of an alias . . . was 'evidence of guilt,' thus lending the court's imprimatur to the prosecutor's error."  Id. at 773.  No such concern is implicated here by the Court's instructions on the

(2d Cir. 2014) ("Objectionable instructions are considered in the context of the entire jury charge . . . ." (quoting <u>Hudson v. New York City</u>, 271 F.3d 62, 67-68 (2d Cir. 2001))).

      E.    <u>The Court's Instruction Defining "Property Involved In" Structuring was Correct and Sufficient</u>

In her Supplemental Argument, Defendant contends the Court's charge defining the "property involved in" language contained in 31 U.S.C. Section 5317(c)(1) was erroneous. The Court's charge was:

> The term "property involved in" includes the following types of properties:
>
>     1)    the property actually structured;
>
>     2)    any commissions or fees paid to the defendant for her structuring;
>
>     3)    any property, including businesses or untainted funds, used to facilitate the structuring offense; and
>
>     4)    any property traceable to such property.
>
> If you find that the real property and the bank accounts constitute property that were involved in the structuring offense, or property traceable to property that was involved in the structuring offense, then you must return a special verdict of forfeiture forfeiting these assets to the United States.

_____

permissible use of circumstantial evidence and how inferences may or may not be drawn.

> "Facilitating property" is any property that made the crime easier to commit or harder to detect. There must have been more than an incidental connection between the property and the offense for you to find that the property facilitated the commission of the offense. However, the property need not have been indispensable to the commission of the offense, nor did the property have to be used exclusively for the commission of the offense or as the exclusive means of committing the offense. Consequently, a property that was used the vast majority of the time for legitimate purposes may nevertheless be forfeited if it facilitated the criminal offense. Facilitation of even a single felony offense is sufficient to justify forfeiture.

(Tr. 963:19-964:20). Defendant avers "the 'involved in' language of 31 U.S.C. § 5317(c) has never been interpreted to reach 'facilitating property' (in contrast with the money laundering statute.)" (Second Motion to Amend at 4-5.) Defendant asserts that the Government's use of money laundering cases to support such an interpretation was incorrect. (Id. at 5-7.)

The Government counters that "the Second Circuit has squarely stated" that Section 5317(c)(1)(A) "is not limited to forfeiture of instrumentalities of an offense." (Opp'n to Motion to Amend at 3 (internal citations omitted).) Additionally, the Government argues the statutory language "for civil forfeitures under 31 U.S.C. § 5317(c)" expressly "authorizes forfeiture of facilitating property." (Id.)

Defendant replies that while there are "many similarly worded 'forfeiture' provisions in the Federal Criminal Law," these provisions "need not be construed as if they are one statute." (Supplemental Reply at 1-2.)  Instead, Defendant notes that "each forfeiture provision may be informed by, but should be construed independently of, the other forfeiture statutes."  (Id. at 2.)

"The court in imposing sentence for any violation of section 5313, 5316, or 5324 of this title . . . shall order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto."  31 U.S.C. § 5317(c)(1)(A).  Section 5317(c)(1)(A) "is not limited to forfeiture of instrumentalities of an offense; rather it mandates forfeiture of 'all property, real or personal, involved in the offense and any property traceable thereto.'"  United States v. Varrone, 554 F.3d 327, 330-31 (2d Cir. 2009) (Sotomayor, J.) (quoting 31 U.S.C. § 5317(c)(1)(A)).

Here, the Court finds no error in the charge defining "property involved in" under § 5317(c) as encompassing facilitating property.  Indeed, the Second Circuit has acknowledged that the "involved in" language used in criminal forfeiture statute 18 U.S.C. § 982 -- which is broadly interpreted to include facilitating property, see Schlesinger, 396 F. Supp. 2d at 271-272 (collecting cases) -- and § 5313(c)(1)(A) are "virtually identical."  Varrone, 554 F.3d 327 at 331.  Moreover,

44

the broader definition applicable to § 982 applies equally to § 5317(c).  Id., 554 F.3d 327 at 331 (holding forfeiture under § 5317(c)(1)(A) is not limited to instrumentalities of an offense, but rather, a broader definition akin to that articulated by the court in Schlesinger applies).  Other courts have likewise held that § 982 and § 5317(c) should be interpreted with reference to the other.  See, e.g., United States v. Seher, 562 F.3d 1344, at 1369 (11th Cir. 2009) (comparing § 982(a)(1) and § 5317(c) and concluding "[g]iven that the two statutes essentially mirror each other, it seems incongruous to interpret those provisions as covering different arrays of property," and there is no policy basis for distinguishing between the two statutes).

Thus, the Court finds that there was no charging error in the definition provided to the Jury.

CONCLUSION

To the extent not explicitly addressed, the Court has considered the remainder of Defendant's arguments and it finds them to be without merit.  For the stated reasons, **IT IS HEREBY ORDERED that** Defendant's motion seeking a judgment of acquittal and for a new trial (ECF No. 152) is DENIED.



SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: May 23, 2023
       Central Islip, New York